

# In the Missouri Court of Appeals
# Eastern District

## DIVISION TWO

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED105903 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of St. Charles County |
| vs. | ) | 1611-CR00696-01 |
| | ) | |
| ORLANDO KIM FERGUSON II, | ) | Honorable Jon Alan Cunningham |
| | ) | |
| Appellant/Defendant. | ) | FILED:  February 26, 2019 |

OPINION

Orlando Kim Ferguson II ("Defendant") appeals from the Judgment upon his convictions

following a jury trial for two counts of first degree statutory sodomy in violation of Section

566.062 RSMo 2000[1], and one count of first degree child molestation in violation of Section

566.067. The trial court sentenced Defendant to eighteen years of imprisonment on both

statutory sodomy counts and to fifteen years on the child molestation count, with all sentences

running concurrently. We reverse and remand for a new trial.

Factual and Procedural Background

In 2005, Defendant and A.R.'s ("Victim") mother ("Mother") began a relationship while

Mother was pregnant with Victim. In January of 2006, Victim was born, and in September of

2007, Mother and Defendant married. Throughout the marriage, Defendant, Mother, Victim, and

---

[1] Unless otherwise indicated, all further statutory references are to RSMo 2000 as amended.

Victim's sibling moved into and out of several apartments and family members' homes until Defendant and Mother separated and later divorced in April of 2013.

In February of 2016, while Victim was in fourth grade, Victim's school arranged for a sexual abuse seminar to be given to her class. During the presentation, Victim began sobbing, approached Dr. Anita Hampton ("Dr. Hampton"), a school counselor, and told her "it happened to me," explaining that Defendant had "touched me in my private area and…made me do bad things," including "suck[ing] his hotdog." Dr. Hampton subsequently called Mother and made a hotline call to the Missouri Department of Social Services Children's Division.

Thereafter, Victim met with Michelle Stille ("Stille"), a forensic interviewer with the Child Center in Wentzville, Missouri. Victim identified four instances of abuse to Stille. First, in "her old old [sic] apartment," Defendant "forced her to suck his thingy." Second, while they were living in Defendant's mother's home, Defendant made her "suck his thingy," which caused her to vomit "because it tasted nasty." Third, at the "new old apartment," she was preparing for a bath when Defendant came in, picked her up, turned her upside down, and "licked her thingy or private part." Finally, while spending the night at a relative's house, Defendant woke her up, brought her into his bed, and "touched her private part on top of her pajamas."

Defendant was charged by third substitute information in lieu of indictment with two counts of first degree statutory sodomy and one count of first degree child molestation. Prior to trial, the trial court granted Defendant's motion in limine seeking to exclude any testimony relating to uncharged acts of domestic violence alleged to have been committed by Defendant. Thereafter, the trial commenced on August 15, 2017.

At trial, Victim explained that she remembered Defendant having, several times, "touched [her] in areas of [her] body that [she] ha[d] learned shouldn't be touched." Victim

2

testified that when she was "around two or three," "[Defendant] stayed on the couch" while Mother was at work, and made her "mouth touch[] his penis." Victim testified that she "bit it [because she] thought it was a hotdog, and [Defendant] got mad." Next, Victim testified that at the "old apartment" when she "was younger, [she] was about to take a bath, and [Defendant] sat on the toilet, put [her] upside down, [and] started licking [her] privates." Victim explained that in 2011, while in Defendant's mother's home, Defendant "had [Victim] go downstairs in [the] basement and…made [her] touch him and do other things" that she "didn't want to [do]" including putting her mouth on "[h]is privates," causing her to vomit. Finally, Victim testified that on another evening, while at Defendant's stepmother's home, Defendant snuck into her room, put her into his bed, and touched her vagina over her pajamas despite her attempts to push his hand away. Victim testified that, initially, she "didn't really know what [Defendant's actions] actually meant," but began to understand "around…kindergarten." Victim testified that she "didn't think [she] should tell" anyone about Defendant's actions because she "was scared that [Defendant] was going to do something." Victim testified, however, that she eventually told a cousin and two friends about Defendant's actions when she was in third grade, but told them "not to tell."

The State next called Dr. Hampton and asked her at length about her education, occupation, and experience. Dr. Hampton testified that she is a school counselor at Victim's school. She testified that she received her master's degree from Lindenwood University and that she has a doctorate in counseling psychology, which she received from Argosy University in Chicago, Illinois. Dr. Hampton testified that she has been working as a school counselor for nineteen years, but that she has no specific training in conducting forensic interviews with children. Dr. Hampton testified that she is a mandated reporter such that, "if someone

discloses…a sexual abuse…it is my job to call and report that situation." Dr. Hampton explained that Victim disclosed to her several instances in which Defendant "had touched her in her private area." After recounting Victim's allegations, Dr. Hampton, over Defendant's objection, testified that she had "[n]o doubt at all" about what Victim told her or whether "this had actually happened to her."

Stille testified that she is a forensic interviewer trained to speak with children suspected of being victims of abuse. She explained that she had 550 hours of training in the areas of child abuse and neglect, and that one third of that training was specific to interviewing. Stille noted that she has personally conducted over 500 forensic interviews and observed over a thousand more. Over Defendant's objection, Stille testified that Victim's interview "was pretty consistent," that Victim "shared details that were specific to those events" including sensory details, and that Victim "corrected me numerous times throughout the interview." Stille testified that these responses are "fairly typical of kids that tend to not be suggestible." Thereafter, Stille explained that Victim disclosed four instances of abuse by Defendant, namely that Defendant "forced her to suck his thingy" twice, causing her to vomit in one instance; that Defendant "picked her up[,] turned her upside down[,] and…licked her thingy or private part;" and that Defendant "touched her private part on top of her pajamas" while she spent the night at Defendant's stepmother's home.

Mother testified for Defendant. During direct examination, she explained that after she and Defendant separated, but prior to their divorce, Mother only let Defendant see the children "if [they] got along," noting that she sometimes kept the children "because [she] was physically abused." Defendant's counsel requested a mistrial, citing his motion in limine, and the trial court instructed Mother not to discuss allegations of domestic abuse further, but denied a mistrial.

4

Thereafter, Defendant's counsel confirmed that Mother and Defendant eventually divorced, and that Mother filed motions to modify the divorce decree seeking supervision during Defendant's visitation of the children. On cross-examination, Mother explained that she sought supervision because Victim's sibling told her that Defendant had him watch the film *50 Shades of Grey*. Defendant's counsel objected, claiming that this testimony was "extremely prejudicial," and the State responded that Defendant "opened that door" by "mak[ing] a big issue of the [divorce] proceedings [and] choos[ing] to say what she did" therein. The trial court overruled Counsel's objection.

Defendant testified, and he denied all of Victim's allegations, explaining that he never exposed his genitals to Victim or engaged in any sexual conduct with her.

At the conclusion of all evidence the jury found Defendant guilty on all counts, and on August 28, 2017, the trial court sentenced him to 18 years of imprisonment on both statutory sodomy counts and 15 years of imprisonment on the child molestation count with all sentences running concurrently. Defendant filed a motion for new trial alleging, *inter alia*, that the trial court erroneously admitted testimony from Dr. Hampton and Stille that improperly vouched for Victim's credibility, and erroneously admitted Mother's prejudicial testimony that Defendant physically abused her and allowed Victim's sibling to watch *50 Shades of Grey*. On August 28, 2017, the trial court denied the motion for new trial. Defendant's appeal follows.[2]

## Standard of Review

In Points I and II, Defendant challenges the trial court's determinations as to the admissibility of evidence. Trial courts have broad discretion in determining the admissibility of

---

[2] Additional facts relevant to Defendant's points on appeal will be set forth, as needed, in the relevant sections below.

evidence, and we review their rulings for an abuse of that discretion, which occurs when a ruling is clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock one's sense of justice and indicate a lack of careful consideration. State v. Rogers, 529 S.W.3d 906, 910 (Mo. App. E.D. 2017). On appeal, we also review for prejudice and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial; an error is not prejudicial if there is no reasonable probability that it affected the outcome of the trial. State v. Cummings, 400 S.W.3d 495, 507 (Mo. App. S.D. 2013).

In Points III and IV, Defendant challenges the trial court's denial of his request for a mistrial. A grant of a mistrial is reserved only for the most extraordinary circumstances to avoid a prejudicial effect and to maintain an impartial jury. State v. Evans, 490 S.W.3d 377, 383 (Mo. App. W.D. 2016). A mistrial should be granted only where the prejudice that a defendant suffers cannot be removed in any other way. Id. Since the trial court is in the best position to determine whether there was a prejudicial effect upon the jury, the decision whether to grant a mistrial is left to the court's discretion, and we also review this decision for an abuse of discretion. Id. To constitute an abuse of discretion, the trial court's decision to deny a request for a mistrial must be clearly against the logic of the circumstances and be so unreasonable as to indicate a lack of careful consideration. Id.

Dr. Hampton's Testimony

In Point I, Defendant argues that the trial court abused its discretion in allowing Dr. Hampton to testify that she had no doubts about Victim's allegations because such testimony invaded the province of the jury by improperly vouching for Victim's credibility. We agree.

At trial, after the State questioned Dr. Hampton at length about her educational background, her experience, and her occupation, the following exchange occurred:

6

[The State:] And you've worked with a lot of kids over the years. Having had an opportunity right then, and [Victim]'s first time she told an adult about this, to see what her demeanor was and the detail she was able to give you, did you have any doubt about whether this had actually happened to her?

[Dr. Hampton:] Oh, gosh, no.

[Counsel]: Excuse me one second. Objection, Your Honor. That's within the scope of the jury. That's not for her to say.

THE COURT: Your response?

[The State]: Your Honor, I think she has a lot of experience about what behavior is consistent when she's talking to children and those who may be telling her things that are not accurate and those who are telling her things that are accurate and it goes to her subsequent conduct in calling her mother, and I expect a further question as well.

[Counsel]: Improper vouching, Your Honor. It goes to the purview of the jury.

THE COURT: Overruled. You may answer.

[The State:] You may go ahead and answer about whether you had any doubt in what she was telling you?

[Dr. Hampton:] No doubt at all.

During closing argument, the State made the following remarks:

The only reason that you are on this jury is because each of you, under oath, indicated that if you believe the testimony of [Victim],…that you could return a guilty verdict…You know that the police department believed her, you know that the school system, her counselor, the prosecuting attorney['s] office, but, ladies and gentlemen, it is now in your lap.

On appeal, Defendant argues that Dr. Hampton's testimony that she had "[n]o doubt at all" about whether the acts alleged by Victim "had actually happened to her" was improper in that it impermissibly vouched for Victim's credibility.

"The credibility of witnesses and the weight of testimony are the province of the fact-finder." State v. Davis, 505 S.W.3d 401, 405 (Mo. App. E.D. 2016) (quoting State v. Crawford, 68 S.W.3d 406, 408 (Mo. banc 2002)) (internal quotations omitted). "As the trier of fact, the jury

7

is the sole arbiter of witness credibility, and it is free to believe or disbelieve all, part, or none of any witness's testimony." State v. Armstrong, 560 S.W.3d 563, 574 (Mo. App. E.D. 2018).

"Generally a lay witness may not testify regarding the witness' opinion on a matter in dispute because the lay witness lacks specialized knowledge about the matter and, therefore, the jury and lay witness 'are in equal positions to form an accurate opinion.'" State v. Presberry, 128 S.W.3d 80, 86 (Mo. App. E.D. 2003) (quoting Winston, 959 S.W.2d at 877). "When the trier of fact is as capable as the witness to draw conclusions from the facts provided, opinion testimony is usually inadmissible." Id. (quoting State v. Gardner, 955 S.W.2d 819, 923 (Mo. App. E.D. 1997)) (internal quotations omitted). "[A] lay person may not give an opinion when 'it has the effect of answering the ultimate issue the jury is to determine.'" Id. (quoting State v. Cason, 596 S.W.2d 436, 440 (Mo. 1980)).

The State argues that Dr. Hampton's testimony was proper because it went to explain her "subsequent conduct and the process leading to Victim's forensic interview." In making this argument, the State relies on State v. Edwards, 365 S.W.3d 240 (Mo. App. W.D. 2012). In Edwards, during the defendant's first-degree sodomy trial, a children's services investigator explained that investigators "only do as much of an interview as we need to, and then we send them to a child advocacy center." Id. at 252. The State then asked whether there the investigator made a "finding on [her] part, which is part of the process, that [the victim] needs to go to the Children's Advocacy Center," and the investigator responded, "Yes, I believed her, so I wanted her to go on." Id. The defendant failed to object, and on appeal, he argued that the investigator's testimony improperly bolstered the victim's credibility such that the trial court should have *sua sponte* declared a mistrial. Id. The Court disagreed, finding that the investigator's testimony "was not so much an opinion regarding [the victim]'s credibility, as it was an explanation for her

decision to terminate the interview," which helped the jury understand why she ended her interview and referred the victim to the children's advocacy center. Id. at 253. The Court further noted that the "State never again referred to [the investigator]'s testimony in subsequent questioning or in closing argument, and independent evidence of [the defendant]'s guilt…was strong." Id.

Edwards is distinguishable. Here, the State did not couch its question about whether Dr. Hampton had doubts about "whether this actually happened" as an inquiry into the procedure she followed as a mandatory reporter. Whereas the State in Edwards asked whether the investigator made the requisite finding, which was "part of the process," that a victim should be sent to the Children's Advocacy Center, here, the State asked Dr. Hampton to merely comment upon whether she believed Victim based upon Victim's demeanor and ability to give detail. Dr. Hampton did not testify that the believability of a child's disclosure is a procedural antecedent to reporting an incident or sending the child to the Child Center. Nor did she testify that she called Mother and sent Victim to the Child's Center specifically because she believed Victim. She testified only that as a mandatory reporter, she reports an incident "if someone discloses…a sexual abuse." Additionally, whereas the State "never again referred to [the investigator]'s testimony" in Edwards, here the State highlighted Dr. Hampton's testimony in closing argument when the prosecutor explained that the jury "know[s] that the school system [and] her counselor" believed Victim.

Here, Victim testified at trial. Although the State asked Dr. Hampton to report upon her assessment of the veracity of Victim's statements, the jury was in a position to observe and assess Victim's testimony and demeanor for itself. As such, the jury was "as capable as [Dr. Hampton] to draw conclusions" about Victim's credibility, such that Dr. Hampton's opinion

9

testimony was inadmissible. Presberry, 128 S.W.3d at 86 (quoting Gardner, 955 S.W.2d at 923). Dr. Hampton's testimony was particularly prejudicial to Defendant in this case, where the State made substantial efforts to imply that Dr. Hampton had superior knowledge through its extensive questioning regarding her education, occupation, and experience that emphasized her having obtained a master's degree, a doctorate degree in counseling psychology, and her having worked as a school counselor for nineteen years. Further, by noting that Dr. Hampton had "worked with a lot of kids over the years" and requesting that she provide her opinion as to the reliability of Victim based upon her having observed Victim's "demeanor…and the detail she was able to give," the State asked Dr. Hampton to opine about Victim's credibility in such a way that suggested to the jury that she was particularly qualified to do so. Finally, the State emphasized Dr. Hampton's opinion during closing argument, noting to the jury, "You know that the police department believed her, you know that the school system, *her counselor* [believed her]…, but ladies and gentlemen, it is now in your lap." Here, the State's case relied predominantly upon testimonial evidence of Victim's allegations to prove its case. By allowing Dr. Hampton to testify as to the believability of Victim's allegations, the trial court allowed her to bolster the credibility of Victim in a case where the jury's verdict hinged upon its finding Victim and her allegations to be credible. See, e.g., State v. Rogers, 529 S.W.3d 906, 916 (Mo. App. E.D. 2017). The trial court abused its discretion in allowing Dr. Hampton to provide her lay opinion as to the believability of Victim's allegations. Point I is granted.

Stille's Testimony

In Point II, Defendant argues that the trial court abused its discretion in allowing Stille to testify that she found the information alleged in Victim's forensic interview to be reliable

because her testimony invaded the province of the jury by improperly vouching for Victim's

credibility. We agree.

During Stille's testimony, the following exchange occurred:

[The State:] Based on your training and experience and having done about fifteen hundred interviews, how would you characterize [Victim] in terms of whether her level of detail gave you any opinion on whether she was a suggestible child or whether she might have been making up these events or remembering them?

[Stille:] So [Victim] was—

[Counsel:] Judge, let me just go ahead and interpose my objection on it goes to the ultimate question and the purview of the jury. So the question is inappropriate.

[The Court:] Thank you. Overruled. You can answer.

[Stille:] So [Victim]—can you repeat that, your question?

…

[The State:] No problem. So having interviewed [Victim], was she able to give you an amount of detail or the information she gave you in the interview, did it give you any opinion, in your training and experience, about whether [Victim], whether what she told you was suggestive of her actually remembering those things or just parroting something somebody else had told her?

[Stille:] So throughout [Victim]'s interview she was pretty consistent. When I would go back to clarify she remained fairly consistent throughout her interview. She shared details that were specific to those events, sensory details and things that she remembered, and she also corrected me numerous times throughout the interview. If I would make a mistake she would stop me and correct me and that is fairly typical of kids that tend to not be suggestible. When children are talking with adults they often view those adults as authority figures and sometimes it can be intimidating for them to do things like correct that person, but she had no problem doing that through the duration of her interview.

[The State:] And what else, if anything, caused you to feel that the information that [Victim] was giving you in that interview was reliable?

[Stille:] [Victim] went through and talked about what happened to her in pretty significant detail at times. One of the reasons that we ask a lot of detail oriented questions in the interview is because sometimes children don't think to offer up that kind of information or even recall that type of information without being asked and [Victim] offered up on her own many times some pretty detailed

11

sensory information, things that she remembered about what she could see or hear or feel at times, and children [Victim]'s age aren't typically able to offer up that type of information without having sexual knowledge that we have as adults. And so being able to talk about those things are just indicative of a child that has not been led to say what brought them to us because even if someone told them part of what to say they would probably not be able to give that type of information without having actually experienced those events themselves.

On appeal, Defendant argues that Stille's testimony regarding Victim's reliability invaded the province of the jury because it was an improper expert opinion on the central issue of Victim's credibility.

"The general purpose of expert testimony is to assist the jury in areas that are outside of everyday experience or lay experience." Rogers, 529 S.W.3d at 911. "[E]xpert opinion testimony should never be admitted unless it is clear that the jurors themselves are not capable, for want of experience or knowledge of the subject, to draw correct conclusions from the facts provided." State v. McWilliams, No. WD80702, 2018 WL 4999171, at *5 (Mo. App. W.D. Oct. 16, 2018) (quoting State v. Taylor, 663 S.W.2d 235, 239 (Mo. banc 1984)) (internal quotations omitted). "Thus…expert witnesses should not be allowed to give their opinion as to the veracity of another witness's statement, because, in so doing, they invade the province of the jury." Rogers, 529 S.W.3d at 911.

Generally, two types of expert testimony are challenged in cases involving the sexual abuse of a child: general and particularized. State v. Churchill, 98 S.W.3d 536, 540 (Mo. banc 2003). "General testimony describes a 'generalization' of behaviors and other characteristics commonly found in those who have been the victims of sexual abuse," while "[p]articularized testimony is that testimony concerning a specific victim's credibility as to whether they have been abused." Id. While the trial court has broad discretion in admitting general testimony, "particularized testimony must be rejected because it usurps the fact-finding role of the jury and

12

thus is inadmissible." Rogers, 529 S.W.3d at 911. This is because "[e]xpert testimony that comments directly on a particular witness's credibility or that expresses an opinion with respect to the credibility or truthfulness of witnesses of the same type under consideration invests scientific cachet on the central issue of credibility and should not be admitted." Id. (quoting State v. Williams, 858 S.W.2d 796, 800 (Mo. App. E.D. 1993)) (internal quotations omitted).

We find State v. Rogers and State v. McWilliams instructive. In Rogers, an expert forensic interviewer testified that several indicators of reliability that a child abuse victim might display during an interview include making spontaneous gestures, displaying emotion, correcting the interviewer, or describing tactile details such as how something felt on his or her body. Rogers, 529 S.W.3d at 912-13. Following this generalized testimony, the expert gave several examples as to how the victim's behavior conformed with those indicators of reliability. Id. at 913-14. The expert testified, *inter alia*, that the victim corrected him several times throughout the interview, that she began to tear up during some of the questioning, and that she demonstrated on her leg how the defendant had "rubbed her private area." Id. at 913-16. The expert concluded that the victim's behaviors were "consistent with someone who has actually been molested." Id. at 915-16. We began our analysis in Rogers by setting out cases that helped illustrate when the line from generalized to particularized expert testimony has been crossed, including State v. Silvey, which found an expert's testimony that a child "displayed behavioral indicators consistent with child sexual abuse" permissible. See id. at 912 (citing 894 S.W.2d 662, 671 (Mo. banc 1995), abrogated on other grounds by State v. Porter, 439 S.W.3d 208 (Mo. banc 2014)). We concluded that "while Silvey and its progeny permit an opinion that a child's behavior is 'consistent with' sexual abuse, we remain wary that an expert's *extensive* personalization of general characteristics, factually dissected and aggregated on an otherwise equivocal record,

13

inevitably bolsters a victim's credibility." Id. at 912 (emphasis in original). Thus, when testimony has crossed this line is necessarily a case-by-case analysis.

In Rogers, we reversed the defendant's conviction, concluding that the State's solicitation of specific examples of how the victim's behaviors conformed with the "indicators of reliability" was particularized testimony constituting an "excessive inquiry as to the…credibility[] of [the victim]'s statements" that invaded the province of the jury. Id. at 916. We further determined that the defendant suffered prejudice because the "State relied heavily on testimonial evidence of [the victim]'s allegations to prove its case," and the interviewer's testimony provided a "stamp of truthfulness" where the jury's verdict hinged on its impression of the victim's credibility. Id.

In McWilliams, an expert forensic interviewer testified that, in assessing a child's interview, an interviewer might look for whether the child provides "idiosyncratic detail," which she defined as a gesture or sound accompanying the child's speaking that is indicative of the child's re-enacting the abuse in question. McWilliams, No. WD80702, 2018 WL 4999171, at *4 (Mo. App. W.D. Oct. 16, 2018). She further testified that an interviewer might consider the child's ability to communicate and the child's efforts to correct the interviewer, as these indicate a lack of suggestibility in the child. Id. at *7. The expert then testified that the six-year-old victim had provided idiosyncratic detail including pointing to her vaginal area to show where the defendant touched her and re-enacting how the defendant quickly walked out of her room after the abuse. Id. at *6. She further explained that the victim corrected her several times, which "was a good thing" because it indicated that she sought "to make sure [the interviewer] had the right information." Id. at *7. On appeal, the Court reversed the defendant's conviction, determining that the State "was asking [the expert] to comment on [the victim]'s credibility," and that the testimony was "designed to buoy and lend credibility to [the victim]." Id. at 8. The Court found

14

that the defendant was prejudiced because, his defense hinged upon the jury's finding that the victim lacked credibility, which would have been "much more effective without [the expert]'s testimony improperly buttressing [the victim]'s credibility." Id. at *9.

Here, Stille first explained that a child's ability to talk about sensory information and describe adult-like sexual knowledge is "indicative of a child that has not been led to say what brought them to us because…[a child] would probably not be able to give that type of information without having actually experienced those events themselves." She further testified that a child's ability to correct an interviewer "is fairly typical of kids that tend not to be suggestible." Beyond this generalized testimony, however, Stille explained that Victim herself was consistent throughout the interview in describing what happened to her and that she did so "in pretty significant detail." She noted that Victim gave "detailed sensory information…about what she could see or hear or feel at times," which children her age "aren't typically able to offer up," and that moreover, Victim had "no problem" correcting her if she made a mistake. Stille explained that this behavior led her to believe that "the information that [Victim] was giving [her]…was reliable."

Stille's testimony referring to Victim's individual performance during the interview was inadmissible particularized testimony. See McWilliams, 2018 WL4999171 at *8. Through this testimony, the "State was asking [Stille] to comment on [Victim]'s credibility," and this "excessive inquiry as to the reliability—i.e., credibility—of [Victim]'s statements was wholly improper." McWilliams, 2018 WL 4999171 at *8; Rogers, 529 S.W.3d at 916. Defendant, in turn, suffered prejudice. "Trial court error in the admission of evidence is prejudicial if the error so influenced the jury that, when considered with and balanced against all of the evidence properly admitted, there is a reasonable probability that the jury would have reached a different

15

conclusion without the error." McWilliams, 2018 WL 4999171 at *8. As noted in Point I, the State heavily relied upon testimonial evidence of Victim's allegations to prove its case. As such, the "jury's verdict hinged on its impression of [Victim]'s credibility," and Stille's particularized testimony invested a "scientific cachet" and "stamp of truthfulness" upon the issue of Victim's credibility, which invaded the province of the jury thereby. Rogers, 529 S.W3d at 916. The trial court, therefore, abused its discretion in admitting Stille's particularized testimony. Point II is granted.

Mother's Testimony That Defendant Had Victim's Sibling Watch *50 Shades of Grey*[3]

In Point IV, Defendant argues that the trial court abused its discretion in denying his request for a mistrial after Mother testified that Victim's sibling told her that Defendant had him watch the film *50 Shades of Grey*. We disagree.

During Mother's direct examination, Defendant's counsel confirmed that Defendant and Mother had divorced in April of 2013 and that under the divorce decree, Defendant was subject to child support obligations and was permitted to see Victim and Victim's sibling every other weekend. Thereafter, Defendant's counsel asked whether "there were motions to modify," and Mother confirmed that there were. When Defendant asked Mother to clarify "what [she was] attempting to modify," Mother answered, "[c]hild support and certain visitation days…and supervision." On cross-examination, the State asked Mother whether she "asked the Court to make [Defendant's] visitation supervised by someone else" because Victim's sibling "came home and told you that the defendant had him watch *50 Shades of Gray* [sic]," and mother responded, "Yes." Defendant's counsel objected and requested a mistrial, arguing that such

---

[3] Regarding Defendant's Point III, we find no abuse of discretion by the trial court in denying Defendant's mistrial request concerning Mother's allegations of domestic abuse by Defendant. Because we are granting a new trial, this issue should not recur on retrial.

16

testimony was "extremely prejudicial" because "the jury is left with [] this notion that, you know, the sex offender…is having his son watching *50 Shades of Gray* [sic]," a sexually-themed film. The State responded that Defendant's counsel "made a decision to make a big issue of the [dissolution] proceedings" and that since he decided to ask Mother about "what she did in the divorce proceedings, she's allowed to say why she made those decisions. He opened that door." The trial court overruled the objection.

On appeal, Defendant argues that the State's reference to the film *50 Shades of Grey* was irrelevant to the charges at issue in this case, particularly where Victim's sibling, and not Victim, was alleged to have been exposed to the film. He further argues that the probative value of the reference was outweighed by its prejudicial effect because it was introduced merely to "paint[] [Defendant] as a bad person who would show sex movies to children."

"The general rule concerning the admission of evidence of uncharged crimes, wrongs, or acts is that evidence of prior uncharged misconduct is inadmissible for the purpose of showing the propensity of the defendant to commit such crimes." State v. Uka, 25 S.W.3d 624, 626 (Mo. App. E.D. 2000). However, "a defendant may not take advantage of self-invited error nor complain about matters he himself brings into the case." Id.

Here, in asking Mother about whether she sought to modify the divorce decree and asking her to identify which aspects of the decree she specifically intended to alter, Defendant's counsel opened the door as to *why* Mother sought the modification. As a result of Defendant's questioning, the State was permitted to ask Mother about her reasoning for altering the divorce decree to mandate supervision of Defendant's visitation of the children, and the trial court did not abuse its discretion in denying a mistrial following Mother's answer. Point IV is denied.

<u>Conclusion</u>

17

We do not disregard the harms suffered by victims of child abuse. However, as a matter of law, the State is prohibited from prosecuting charges in such a way that usurps the role of the jury and violates a defendant's right to a fair trial. Given that the State's witnesses, Dr. Hampton and Stille, commented on the believability and reliability of a very young victim in a highly disputed case without physical evidence, Points I and II are granted. The Judgment is reversed and remanded for a new trial.

_____
Honorable Mary K. Hoff

Philip M. Hess, Presiding Judge and Robert G. Dowd, Jr., Judge:  Concur