

# In the Missouri Court of Appeals
# Eastern District
## DIVISION TWO

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED112288 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court of |
| | ) | St. Charles County |
| vs. | ) | 2211-CR00811-01 |
| | ) | |
| ANTHONY D. BROOKS, | ) | Honorable W. Christopher McDonough |
| | ) | |
| Appellant. | ) | Filed: June 3, 2025 |

Before Lisa P. Page, P.J., Angela T. Quigless, J., and Rebeca Navarro-McKelvey, J.

Anthony Brooks (Defendant) appeals from his conviction after a jury trial of one count of second-degree domestic assault, one count of second-degree kidnapping, one count of first-degree rape, and one count of first-degree sodomy. We affirm.

## BACKGROUND

Defendant was charged by substitute information in lieu of indictment with the class D felony of domestic assault in the second degree; the class D felony of kidnapping in the second degree; the unclassified felony of rape in the first degree; and the unclassified felony of sodomy in the first degree, all for conduct involving his former girlfriend (Victim) on March 8 through March 9, 2022. Defendant does not challenge the sufficiency of the evidence to support his convictions; thus, we view the evidence in the light most favorable to the verdicts.

During a two-day trial, the State of Missouri (state) presented evidence from several witnesses, including Victim, who testified about her relationship with Defendant. She began

living at his mother's house within the first week they met, and these events occurred about a year later when they were no longer living together but still "working on" their relationship. Victim testified that Defendant first began physically abusing her about four months into the relationship. It continued to the point it caused her to lose her job. However, Defendant always apologized and said he wanted to be better.

Victim testified that on March 8, 2022, they spent the afternoon and evening together when Defendant repeatedly became so upset with her that he took her to dark, secluded locations where he was physically violent to her by pulling her by the hair, slapping her face, and forcing Victim to perform sex acts against her will. Defendant took Victim's gun from her car and removed all but two of the bullets from the magazine, and said they were "going to get to the bottom of this." He continued punching her while holding the gun. He put his foot on her neck, pulled her arms, and slammed her into rocks when she tried to escape. He shattered her phone when she tried to call 911. Defendant had Victim write her mother a goodbye note. He sent a text, which included Victim's address, asking the recipient to take care of Victim's family if anything happened to him. Victim pleaded that they could get married and promised not to tell anyone about that night; she said they could get a hotel room while she healed, like she had other times he had beaten her. Defendant pointed the gun at Victim and told her he "didn't want to do it," while shaking and crying. He gave Victim the gun but Victim shot it in the air. She said she did not want to shoot him because she loved him and wanted him to get help.

Defendant and Victim drove to a gas station where Defendant got some napkins to help clean Victim's bleeding injuries. He apologized and repeatedly told Victim he loved her. However, while driving, Defendant again became upset and started hitting her. Victim jumped out of the car and tried to wave down help. Defendant came after her and when she pleaded to let her go, he said, "you're not going anywhere." Victim said, "please don't make me do this,"

2

and Defendant replied, "b**ch, you're not going to do nothing. I done beat you so many times you ain't fought back. You're not going to do sh*t." As Defendant continued toward Victim, she shot him, turned around and ran. When he screamed for Victim not to leave him there, Victim returned and helped him back into the car. They drove to a gas station and called for help.

At first, when en route to the hospital in the same ambulance, Victim agreed with Defendant when he told police he was shot by someone who jumped him. Eventually Victim told her mother Defendant caused her injuries when she saw her at the hospital. Then Victim told police she shot Defendant because he was assaulting her. However, Victim only disclosed "some of what happened," but not everything.

Police testified regarding Victim's injuries and searched Defendant's phone and found the messages he sent with Victim's address. They also found a message to the same person the next morning that said "Got shot." Victim met with police again a couple days later and explained what happened, but denied that anything sexual happened that night. The police followed up with Defendant who claimed he couldn't remember anything except that he went to sell some shoes with people who jumped and shot him. When the detective told Defendant that Victim said he caused her injuries, he denied it. The detective called Victim again and she apologized for not being completely straightforward. Victim did not want her mom to kick her out because she did not agree with her relationship with Defendant. She provided information about the sexual assault then, along with the other details up to the point when she shot Defendant and accompanied the detectives to verify the areas where the incidents had occurred.

Defendant did not present any evidence and his motion for a directed verdict was denied.

*Motion to Exclude*

Prior to trial, Defendant filed a "Motion to exclude State's expert witness, or in the alternative, for a *Daubert*[1] hearing on the issue of admissibility." Defendant argued the state would attempt to introduce testimony from J.W. concerning the cycle of domestic violence, which was "not relevant as it [was] not needed to assist the trier of facts [to] understand the evidence or determine a fact in issue." Defendant further argued J.W.'s testimony was not reliable.

*Expert Witness Hearing*

The trial court held an expert witness hearing on the first day of trial, during which time J.W. testified with respect to her qualifications, including her twenty-three years of employment at St. Martha's (a place for battered women and children), first as a program director and then as the executive director. She had a bachelor's and a master's degree in social work and was a licensed clinical social worker. At her workplace, she provided services including housing, education, and access to an attorney or counseling referrals for about 2,300 to 3,000 women who had been victims of domestic violence.

J.W. explained that in the twelve to fifteen times she had previously testified at trial, "[i]t has always been general" testimony, not particular. She had never been given the facts of any case in which she had testified, and "ma[d]e it very clear" that she did not want the facts of the case. Her testimony in Defendant's case "would be offered to give general testimony of behaviors and character[istic]s commonly found in those who have been the victims of domestic

---

[1] The *Daubert* standard is a reference to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), which applies to federal cases. However, it is not necessary to alternatively request a *Daubert* hearing because "all you really need to know about the admissibility of expert testimony" is found in the "straightforward statutory words" in Section 490.065. *State v. Mills*, 623 S.W.3d 717, 730 (Mo. App. E.D. 2021) (internal citation omitted). Moreover, pursuant to Section 490.065, any "inquiry about admissible evidence is to be flexible, and no single factor is necessarily dispositive of the reliability of a particular expert's testimony." *State ex rel. Gardner v. Wright*, 562 S.W.3d 311, 319 (Mo. App. E.D. 2018).

violence and sexual assault." Initially, the trial court granted Defendant's motion to exclude, but then reconsidered its ruling the next day of trial. Defendant repeated his objection that the state did not meet its burden to show that J.W. "has followed any sort of methodology or study to allow that testimony to come in under the *Daubert* standard." He added it was not relevant and it would have a highly prejudicial effect. The court reversed its prior ruling and permitted J.W. to testify.

*J.W.'s Trial Testimony*

At the beginning of J.W.'s trial testimony, Defendant objected "pursuant to [his] pre-trial motion that the Court heard." The objection was overruled and the court granted Defendant a continuing objection.

J.W. testified she was not at all familiar with the facts of this case, she had never spoken to any witnesses, and had not seen any evidence whatsoever. She discussed "some common behaviors exhibited by victims of domestic abuse," which included "tactics that one person will use to maintain . . . power and control over another person" such as the non-physical "emotional, verbal[,] and mental abuse," isolation, financial abuse, and using children to maintain power and control. She explained that expected behaviors from victims are feelings of shame or guilt, depression, anxiety, or doubt that people will believe them.

She said it was common that victims make up stories or leave out details about what had happened. She gave an example on how victims minimize risk: "when [a victim] goes back or if she doesn't cooperate with the police . . . some people might see it as her giving in to certain demands, she is actually doing that because she knows if she doesn't it's going to make things much worse." She explained why a victim does not "just leave" her abuser, including logistical reasons like finances or not having a place to go; emotional reasons like believing the abuser can change; or safety reasons because leaving creates more risk for them.

5

J.W. also discussed the three phases of the "circle of violence," including (1) tension building; (2) physical violence or escalation of the abuser's other tactics; and (3) the honeymoon phase or remorse phase in which the abuser makes "all kinds of promises." She said that every victim does not look or act the same way. She provided an example she had seen in some domestic-violence situations, including some with and without physical injuries. She explained that demeanor also can vary by victim.

J.W. further provided examples of victims lying or hiding their injuries, stating, "I have known women typically that lie about how they got the injuries and will blame something besides the violence on how they got their injuries." She added she remembered a woman with a broken nose or a black eye saying she opened a cabinet too fast and it hit her face. She also said a woman might "refuse to tell anyone what happened" instead of sharing things she feels shame and guilt about with no guarantee to help her but instead putting her more at risk. She explained,

> So one of the common ways we see this play out is she calls 911 and then the violence escalates and by the time the police get there she is saying no, it wasn't him, I didn't mean to call 911, whatever she comes up with, not because she doesn't care or not because she doesn't want help, but all she was thinking about when she called 911 is that she needed it to stop in that moment.

She said it was "more the norm" for victims of domestic violence not to want to cooperate with the police and the prosecution, especially because there is no guarantee the perpetrator is going to be found guilty and that the victims will be safe.

J.W. further testified there are "different reasons" for victims of domestic violence to change their story, including "trauma, that when you're in a traumatic situation your brain is not necessarily recording all of these details." She explained it was "not unusual" for a woman in a domestic violence relationship to never call the police. A victim might minimize or deny the abuse. Additionally, she said it was common for women to fight back as a "survival skill that all

6

of us have," but this "doesn't mean that it's mutual violence because . . . he still has some power over her."

J.W. began to give a personal example of trauma stating, "I can give you an example. Roughly two years ago I was on vacation and I got a phone call after being there for twenty-four hours that my – " Defense counsel objected, stating, "It goes beyond the scope of what the Court had agreed for this testimony." The court overruled the objection. J.W. then gave her example:

> So a traumatic event. Got a phone call that my dad had died. I don't remember changing my flight to get home, I don't remember calling the airline, I don't remember going to the airport, but I know I'm not still on the beach, right, and I can remember things that happened. That's how trauma works. If your brain doesn't need that detail at the moment to get through it's not going to record it, you're never going to get it. It's not a memory that you've forgotten, it was never recorded.

During cross-examination, J.W. explained that when women came into the shelter, she does not judge their story. She also does not talk to them about what they say happened. When asked about whether she determines their veracity, she answered, "No. I have no way of knowing that for sure." J.W. also reiterated that different people may act differently in domestic violence situations.

*Closing*

During closing arguments, the state preemptively addressed Defendant's argument that Victim's story was inconsistent, and that she did not disclose everything until later. The prosecutor said Victim finally told police about the abuse because she was ashamed, scared, embarrassed, and hurt. The state then explained why J.W. testified at trial, even though she "knows absolutely nothing about the facts of this case. Zero, nothing. She has never spoken a word to [Victim] or any other person that testified in this case, nothing." The state explained she is an expert in domestic violence behaviors and she could help make sense out of why women in these situations wanted the behavior to stop but at the same time tell a person they love them and

7

do not end the relationship. The prosecutor said, "because it's something that it's hard to comprehend. It's hard to conceptualize why didn't [Victim] just leave."

Defendant argued during closing that Victim's story had too many inconsistencies and she had a motive to lie to avoid getting in trouble for shooting him. He also addressed J.W.'s testimony, explaining the state brought her in "to try and bolster [Victim's] statement to try and make it make sense, but it doesn't." The defense highlighted her lack of personal knowledge about the case, but argued, "everything she said was planted in a way" to bolster Victim's testimony. The defense reminded the jury of J.W.'s testimony that "there's no knowing what someone will do" and that J.W. testified because the state could not prove its case and the jury should disregard the inconsistent statements that don't make sense.

The jury found Defendant guilty on all counts as charged. Defendant filed a motion for new trial or for judgment of acquittal and argued prior to sentencing that J.W.'s testimony, using the example of her father's death, bolstered the victim's testimony and was prejudicial for Defendant by providing "the State an excuse as to why the victim had multiple inconsistencies in her statements to the police." The court denied Defendant's motion and sentenced him to consecutive terms of seven, seven, twenty-five, and twenty years of imprisonment, for a total of fifty-nine years. This appeal follows.

## DISCUSSION

In his sole point on appeal, Defendant alleges the trial court abused its discretion overruling his objections and admitting J.W.'s expert testimony describing her personal experience with a traumatic event, in derogation of Defendant's rights to due process of law and to a fair trial under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 18(a) of the Missouri Constitution. Defendant argues this testimony gave the jury a means to excuse gaps in an alleged victim's testimony, specifically, J.W.'s

8

personalization of her experience, which was functionally equivalent to an opinion on Victim's credibility and, thus, inadmissible particularized expert testimony. Defendant claims whether Victim fabricated the allegations of sexual abuse against Defendant was the crucial factual proposition of trial, and therefore admission of J.W.'s "ostensibly particularized expert testimony bolstering [Victim's] credibility" was reasonably likely to affect the outcome of trial.

<u>Standard of Review</u>

The parties disagree as to whether the alleged error regarding J.W.'s testimony was preserved. Defendant contends the argument is preserved for appeal but the state contends it is not because Defendant changed the theory of his objection on appeal. Here, defense counsel first raised the issue of admissibility of J.W.'s testimony as a "motion to exclude State's expert witness, or in the alternative, for a *Daubert* hearing on the issue of admissibility." During an expert witness hearing on the first day of trial, Defense counsel argued J.W.'s testimony was unreliable, irrelevant, and unnecessary to assist the trier of facts to understand the evidence or determine a fact in issue. When defense counsel objected to J.W.'s testimony, which was giving her personal example of failing to record a traumatic event, he stated it "goes beyond the scope of what the Court had agreed for this testimony." The court overruled the objection. The state claims that Defendant now argues on appeal more specifically that J.W. was providing inadmissible particularized testimony that vouched for Victim's credibility, which expands his theory raised before and during trial. Thus, this claim is entitled only to plain error review. We disagree. The court was fully cognizant of Defendant's objections to expert's testimony, as was the state. *See State v. Baker*, 103 S.W.3d 711, 717 (Mo. banc 2003) (acknowledging the continued validity of an objection where "it was mutually understood that appellant did not intend to repudiate his prior objection . . . ."). While best practices might include a second objection after the example, the Defendant's timely objection and claims raised in the post-trial

9

motion are sufficient to preserve the issue on appeal. *State v. Teter*, 665 S.W.3d 306, 312 (Mo. banc 2023) ("[T]o preserve claims of error for appellate review in cases tried by a jury, claims of error must be raised in post-trial motions." (internal quotation omitted)). Thus, we review for an abuse of discretion and not plain error. As such, the decision to admit evidence is "within the sound discretion of the trial court." *Elliott v. State*, 215 S.W.3d 88, 92 (Mo. banc 2007). "[W]e will not disturb this [broad] discretion unless it is against the logic of the circumstances and so unreasonable as to show a lack of careful consideration." *State v. Patrick*, 566 S.W.3d 245, 253 (Mo. App. W.D. 2019) (internal citation omitted).

*Analysis*

Generally, expert testimony is used to assist the jury in understanding areas outside of the everyday experiences or lay experiences. *State v. Pickens*, 332 S.W.3d 303, 321 (Mo. App. E.D. 2011). However, expert witnesses should not give their opinion as to the veracity of another witness's statement because it invades the province of the jury. *State v. Churchill*, 98 S.W.3d 536, 538-39 (Mo. banc 2003). There are typically two types of expert testimony: general and particularized. *Id*. at 539. General testimony describes behaviors and other characteristics commonly found in those who have been victims of sexual abuse, while particularized testimony concerns a specific victim's credibility as to whether they have been abused. *Id*.; *State v. Loper*, 609 S.W.3d 725, 736 (Mo. banc 2020). The trial court has broad discretion in admitting general testimony, but must reject particularized testimony because it "usurps the decision-making function of the jury and therefore, is inadmissible." *Churchill*, 98 S.W.3d at 539.

Defendant argues J.W.'s testimony about her personal experience with lapsed memory in response to trauma was functionally indistinguishable from inadmissible particularized expert testimony and it was outcome determinative. However, even Defendant admits the challenged testimony "does not perfectly fit within the classic ambit of particularized testimony, since such

10

testimony typically entails specific references to the credibility of the alleged victim's testimony. . .," citing the example, *State v. McWilliams*, 564 S.W.3d 618, 624-25 (Mo. App. W.D. 2018).

Defendant argues *State v. Ferguson*, 568 S.W.3d 533, 544 (Mo. App. E.D. 2019), and *State v. Rogers*, 529 S.W.3d 906, 916 (Mo. App. E.D. 2017), demonstrate that any expert testimony that touches on "indicators of reliability" may be inadmissible as excessively particularized. However, in *Rogers*, the forensic interviewer gave generalized trial testimony about challenges in interviewing children, the stages of disclosure, source monitoring, scripted versus episodic memory, and the presence of sensory detail. 529 S.W.3d at 912. The actual interview with the victim child was then played and followed up by further examination of this expert, during which the state elicited and even supplied specific and detailed examples of how this child's behavior fit the general description he gave earlier. *Id.* at 912-16. This court found the trial court abused its discretion in permitting the particularized testimony, in which the state elicited at least twenty specific examples of how the victim's statements or behavior evinced a common profile. *Id.* at 916.

Similarly, in *Ferguson*, the expert went beyond generalized testimony and explained the victim herself was consistent throughout the interview in describing what happened to her and that she did so with significant detail. 568 S.W.3d at 544. The expert specifically noting the victim gave "detailed sensory information . . . about what she could see or hear or feel at times," which children her age "aren't typically able to offer up," which led her to believe the information the victim gave her was reliable. *Id.* The court held this testimony referring to the victim's "individual performance during the interview was inadmissible particularized testimony" and the state's inquiry as to the reliability of the victim was "wholly improper." *Id.* (internal quotations omitted).

11

However, unlike *Rogers* and *Ferguson*, Defendant cites no testimony or argument here where J.W.'s testimony is specifically applied to Victim. Defendant argues J.W.'s testimony detailing her personal memory loss surrounding a traumatic event was intended to serve as an indicator of reliability that could be matched with similar such memory gaps in Victim's testimony as the alleged victim of a traumatic event. But J.W.'s example made no specific connections to Victim or even to sexual trauma to become particularized testimony. Moreover, we find J.W.'s testimony regarding her personal trauma experience is not different from her testimony regarding her observations of behavior, typical to victims of domestic violence. Just because the example was personal to her, it does not somehow transform into particularized testimony that Victim was telling the truth.

Instead, we find instructive *State v. Baker*, 422 S.W.3d 508, 514-15 (Mo. App. E.D. 2014), where this court rejected the defendant's theory that the state transformed the expert's general testimony into particularized testimony, even when the prosecutor elaborated on each phase of disclosure explained by the expert and used them to justify discrepancies in the victim's testimony. The expert never expressed an opinion on the victim's credibility, and the state was entitled to argue reasonable inferences from the evidence. *Id*. at 515.

Additionally, we find *State v. Harris*, 305 S.W.3d 482, 490 (Mo. App. E.D. 2010), demonstrates the general purpose of the expert testimony to fill in the gaps where the jury does not have everyday experience or lay experience about the facts at issue. In *Harris*, the court found the trial court did not err by allowing the expert video to be played because her testimony regarding the amount of force required to inflict injuries such as those sustained by the victim was a matter outside the common experience of the jurors. *Id.* at 491. The expert merely commented on the ultimate issue of the cause and nature of the victim's injuries without commenting on the defendant's responsibility for those injuries. *Id.* Here, similarly, J.W.'s

12

comments explained common behavior demonstrated by a domestic violence victim or a person involved in traumatic events. J.W.'s testimony helped explain why a victim would stay with her abuser, continue helping him, and even how one's brain may not register all the events that occurred in the midst of the trauma.

J.W.'s testimony that she was not given any facts of the case, nor did she speak to Victim or witnesses at all, merely served the general purpose in assisting the jury in understanding common behaviors of victims of domestic violence and trauma and allowed the jury to make its own inferences about this Victim. As in *Baker*, here the state was permitted to argue reasonable inferences from the evidence. 422 S.W.3d at 515; *see also State v. Thomas*, 290 S.W.3d 129, 135 (Mo. App. S.D. 2009) (prosecutor connected victim's behavior to characteristics described by expert but court held expert's testimony was not particularized and did not speak to the victim's credibility).

Accordingly, we find the trial court did not abuse its discretion in allowing J.W. to testify about generalized behaviors of people involved in trauma, including her own experience when her father passed away. Defendant's point is denied.

## CONCLUSION

The judgment of the trial court is affirmed.

_____
Lisa P. Page, Presiding Judge

Angela T. Quigless, J., and
Rebeca Navarro-McKelvey, J., concur.

13