

# In the Missouri Court of Appeals
## Eastern District

### DIVISION FOUR

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED106525 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court of |
| | ) | of the City of St. Louis |
| vs. | ) | 1722-CR00525 |
| | ) | |
| RASHIDI DON LOPER, | ) | Honorable Thomas C. Clark, II |
| | ) | |
| Appellant. | ) | Filed: November 12, 2019 |

### OPINION

Rashidi D. Loper appeals the judgment of the Circuit Court of the City of St. Louis entered after a jury found him guilty of first-degree attempted rape, first-degree domestic assault, second-degree domestic assault, tampering with a victim, and two counts of armed criminal action. He raises five points here, each challenging separate evidentiary rulings of the trial court. We find the trial court erred with respect to one of those rulings—the admission of certain opinion testimony—requiring us to reverse his conviction for first-degree domestic assault and his associated convictions for armed criminal action and victim tampering for which he was sentenced to 15 years in prison. We leave standing the remaining convictions, for which he was sentenced to a total of 12 years. Accordingly, we affirm in part and reverse and remand in part.

This prosecution arose from the violent morning of April 3, 2015, at Victim's apartment. Loper, with whom Victim had previously resided at another apartment during their prior romantic

relationship, went to Victim's apartment that morning. The State sought to prove that while there Loper attempted to rape Victim while strangling her with his hands, that he then strangled her again with a telephone cord, and that he cut her wrist with a knife. For her part, Victim testified she had no memory of Loper strangling her with the telephone cord or of him cutting her wrist, because according to her testimony, she lost consciousness when Loper strangled her with his hands while attempting to rape her. Victim testified that when she regained consciousness, Loper had left the apartment, and she was lying in the bathtub with one of her kitchen knives laying between her legs and with a deep cut to her wrist.

At trial, Loper's main defense—apart from arguing that the State failed to meet its burden of proof on the charges—was that Victim's wrist injury, in particular, was self-inflicted. He testified that Victim had attempted suicide before and he elicited on cross-examination of Victim that when she regained consciousness, she considered the possibility that she had cut herself.

In light of the lack of physical evidence such as DNA or fingerprints linking Loper to the knife cut, the gaps in Victim's memory of the events, and the dispute between Victim's and Loper's accounts, the State adduced opinion testimony to prove that these crimes, including the knife attack, were in the nature of domestic violence. Detective Kara Lindhorst, one of the investigating police officers, testified to the facts of her investigation and also gave her opinions regarding the characteristics of domestic violence crimes and how those characteristics were manifested in the context of these crimes. She testified based on her "training and experience" in attending domestic-violence training courses and handling "thousands" of such cases, that "domestic violence" is "all about power and control." Then she opined that she "absolutely" witnessed "evidence of power and control in this case"—including, specifically, "the strangulation" and "the

2

cut on [Victim's] wrist" which formed the basis for the two counts of domestic assault and associated armed criminal action here.

We find the trial court abused its discretion by allowing the State to adduce Det. Lindhorst's opinion testimony that Loper exercised "power and control" over Victim here as charged. This testimony invaded the province of the jury because it impermissibly vouched for the credibility of the State's case and for Victim's testimony, and supplied improper verisimilitude on the critical issue of Loper's guilt of the charged acts of domestic violence. *See State v. Taylor*, 663 S.W.2d 235, 239-42 (Mo.banc 1984) (holding such opinion testimony to be inadmissible); *State v. Rogers*, 529 S.W.3d 906, 910-16 (Mo.App.E.D. 2017) (same); *State v. Williams*, 858 S.W.2d 796, 798-802 (Mo.App.E.D. 1993) (same).

Accordingly, we reverse the judgment of conviction and remand for a new trial on the charges of first-degree domestic assault and armed criminal action for cutting Victim's wrist, and on the charge of victim tampering, predicated on Loper's guilt of that domestic assault charge. However, because we find the evidence was overwhelming that Loper committed second-degree domestic assault and armed criminal action by strangling Victim with a telephone cord, and that he committed first-degree attempted rape, we affirm the judgment as to those convictions.

Given our disposition of Loper's challenge to the admission of Det. Lindhorst's testimony, we have concluded it is necessary and appropriate for us to address only one of Loper's four remaining evidentiary challenges on appeal.[1] Due to the nature of Loper's remaining allegations

---

[1] Loper asserts (1) that Dr. Quattromani's testimony that Victim's wrist injury likely was not self-inflicted was an inadmissible surprise opinion; (2) that Officer Pierce gave hearsay testimony relating the statement of a "doctor" to the same effect; (3) that Michelle Schiller-Baker's testimony about the general behaviors of domestic violence victims invaded the province of the jury; and (4) that the trial court committed plain error by excluding evidence of an incident that occurred two years after the charged offenses where Victim allegedly attempted to strike Loper with a tire iron.

3

of error and the likelihood that particular evidentiary issues may be avoided on remand, in our view only Loper's challenge to the admission of Michelle Schiller-Baker's testimony regarding the general behaviors of victims of domestic violence presents an issue that is "so likely to arise [on remand] that it is appropriate to address [it on appeal prior to the proceedings' return to the trial court]." *State v. Hart*, 404 S.W.3d 232, 241 (Mo.banc 2013).

## Background

Beginning in 2009, Victim and Loper were intermittently romantically involved and cohabitated. On April 3, 2015, Victim and Loper had not seen one another for approximately five months. That morning, Victim allowed Loper to enter her apartment and follow her up to her bedroom, but their accounts of what happened after that diverge. Loper testified that he and Victim began a consensual intimate encounter but that he stopped before they engaged in sexual relations because another of his girlfriends came to his mind. He testified that he then attempted to leave Victim's apartment, but that Victim attacked him, and to get free from her, he had to push her away with his hands around her throat.

Victim's account was much different: She testified that during Loper's visit, as she lay in bed, he pulled the covers off of her and pulled her toward him by her legs. She said that after she told Loper she did not want to have sexual relations with him because she had not seen him for six months, he pulled his pants down and then tried to pull hers down. She stated that she tried to fight Loper by kicking at him and pulling at her own pants, and that he responded by grabbing her around the throat with both of his hands and choking her to the point where she could not breathe and she lost consciousness.

Victim testified that when she regained consciousness, she was lying on her back in her bathtub which was filling with water from the shower head. She had no clothes on, her wrist had

been severely cut, and one of her kitchen knives was between her legs. There was blood on the floor and on the walls of the bathroom. She immediately climbed out of the bathtub, wrapped her wrist in a sweatshirt, crawled to her telephone, and called 911. Initially, Victim told 911 and first responders that she might have cut her own wrist though she could not recall doing so. But after an emergency medical technician provided her with oxygen for a few minutes, she testified, she remembered Loper had been at her apartment, and thereafter she told everyone who asked her about the cause of her wrist injury, that Loper had cut her wrist.

The State charged Loper with first-degree attempted rape for trying to force Victim by strangling her with his hands to have sexual relations with him; first-degree domestic assault and armed criminal action for strangling Victim with a telephone cord; first-degree domestic assault and armed criminal action in connection with cutting Victim's wrist; and victim tampering in light of evidence relating to Loper's attempts to influence Victim's testimony.

At trial, in addition to Victim's account, the State presented the testimony of Officer Wesley Pierce, a police officer who responded to Victim's apartment; Christine Dooley, a paramedic; Detective Kara Lindhorst, an investigator who became involved once the case was referred to the police department's Domestic Abuse Response Team (DART); Michelle Schiller-Baker, an expert on the behavior of domestic violence victims; Dr. Erin Quattromani, the emergency room physician who treated Victim's wrist injury; and Kathy Howard, a sexual-assault nurse who examined Victim.

Officer Pierce testified that when he arrived at Victim's apartment building, he found her sitting inside the building, at the bottom of the stairwell outside her unit, unclothed and disoriented, with red, swollen eyes and a towel or shirt wrapped around her wrist, and near some spatters and a pool of blood. He stated that "she didn't know exactly what happened to her. She didn't know

if she tried killing herself. She stated that she didn't have any reason to do that. She didn't know why she had a cut on her left wrist." Officer Pierce testified that at first he suspected Victim may have attempted suicide.

When he searched the apartment, Officer Pierce found the water running in the bathroom; a knife in the bathtub and blood on the walls and floor just outside it; and "trails of blood" leading into different rooms of the apartment. He then went to the hospital to check on Victim's condition and while there he spoke with "[t]he doctor" to determine "which way to take [the] investigation." When the doctor stated she did not believe Victim's wrist injury could have been self-inflicted, Officer Pierce handed the case over to DART.

Paramedic Dooley testified that Victim's wrist had a "large laceration" and she "noticed ligature marks around [Victim's] neck" indicating she had been strangled by "something thin." Dooley related that in the ambulance on the way to the hospital, "[a]t first [Victim] told me she didn't know what happened. She woke up in the bathtub confused. Thought maybe she had harmed herself." But after Victim "[came] around more, [woke] up more," Dooley testified, Victim told her that "she remembered her ex-boyfriend pushing his way through the door [and] taking her onto the bed, strangling her," and then "waking up in the shower."

The State next called Detective Lindhorst who stated that at the scene, she found "sprays" of blood in the bathroom, the knife in the bathtub, and "spatters," "pools," and "trails" of blood throughout the apartment, including on Victim's bedroom mattress and on the tangled spiral cord of her land-line telephone. She seized the knife and the phone cord as evidence in light of Victim's wrist injury and the "ligature mark on [Victim's] throat that was [in the form of] hatch marks." And she testified that she later interviewed Loper, whom she identified as "the offender" here.

6

The State's next witness, Michelle Schiller-Baker, testified as an expert on the general behaviors and characteristics of domestic violence victims. Then, Dr. Erin Quattromani, the emergency room physician who treated Victim's wrist injury, testified that Victim's wrist had an "obvious large laceration" that was "wide across the wrist," and that some of her tendons were cut. She testified that while it was possible such an injury could be self-inflicted, due to the depth and length of the injury, and based in part on Victim's representations to her, she concluded it was likely not self-inflicted. And sexual-assault nurse examiner Kathy Howard, who examined Victim's injuries in the emergency room, testified in accord with Dr. Quattromani that Victim had numerous injuries indicating that she had been strangled, including hemorrhaging in her eyes, burst blood vessels on her face, facial and neck lacerations, lip swelling, and chin and tongue bruising. Nurse Howard also testified that Victim had a "pattern injury" on her neck that was consistent with being strangled with a ligature, or cord.

In addition, the State introduced extensive photographic and other documentary evidence of Victim's injuries and of the scene at the apartment. The State did not present any DNA or fingerprint evidence attributable to Loper.

The jury found Loper guilty of the lesser included offense of second-degree domestic assault for strangling Victim with the telephone cord and found him guilty as charged on all other counts. Loper was sentenced to 15 years in prison for first-degree domestic assault and three years for the associated armed criminal action; seven years for first-degree attempted rape; five years each for second-degree domestic assault and the associated armed criminal action; and three years for victim tampering. Loper's sentences were ordered to run concurrently except for the seven-year sentence for first-degree attempted rape, which was ordered to run consecutively to the other sentences, for a total of 22 years in prison.

This appeal follows.

## Discussion

1. *Loper adequately preserved his claim of error with respect to Det. Lindhorst's opinion testimony.*

The State argues that Loper failed to preserve his claim that the trial court erred by admitting Det. Lindhorst's opinion testimony. We disagree.[2] To preserve a claim of error, counsel's objection must be sufficiently specific to apprise the trial court of the grounds for the objection. *State v. Amick*, 462 S.W.3d 413, 415 (Mo.banc 2015) (citing *State v. Stepter*, 794 S.W.2d 649, 655 (Mo.banc 1990)). And on appeal, the party asserting error must rely on the same theory that supported its objection at trial, or the issue is not preserved. *State v. Schneider*, 483 S.W.3d 495, 504 (Mo.App.E.D. 2016).

In this case, we conclude Loper's trial objection and his motion for new trial reasonably apprised the trial court of the same, sufficiently-specific issue Loper raises on appeal: that Detective Lindhorst's opinion testimony went beyond her competence and invaded the province of the jury in that it injected statements that were unhelpful to the jury, lacked foundation, and were irrelevant to the issues on which expert testimony could be considered proper. *See State v. Cochran*, 365 S.W.3d 628, 634-35 (Mo.App.W.D. 2012) (describing testimony that went beyond the competence of the expert and invaded the province of the jury as unhelpful and irrelevant).

While the State points out that Loper's objection at trial and in his motion for new trial may have been worded differently than his objection here on appeal, we apply our rules for

---

[2] Even were we to consider this point unpreserved, as discussed below, the trial court's decision here would not withstand plain error review. *See State v. Rogers*, 529 S.W.3d 906, 910 n.3 (Mo.App.E.D. 2017) (citing *State v. Williams*, 858 S.W.2d 796 (Mo.App.E.D. 1993)) (stating the same where the opinion testimony of one of the State's witnesses invaded the province of the jury and thereby resulted in "fundamental error" as characterized by *Williams*).

preservation not to enable us to avoid review, nor to make preservation of error difficult, but to ensure the trial court was—and that we are—able to define the precise claim made. *Id.* (citing *State v. Pointer*, 887 S.W.2d 652, 654 (Mo.App.W.D. 1994)). Critically, here, the record shows that at every stage, Loper objected to Det. Lindhorst's testimony on the grounds that it stated an opinion outside her competence. Loper's trial objection was that the challenged testimony was inadmissible "personal opinion." The objection in his motion for new trial was that the testimony was "irrelevant, outside of [Det. Lindhorst's] training and experience." And Loper's point on appeal asserts error in the admission of Det. Lindhorst's testimony on the grounds that it had no adequate foundation but rather inserted improper opinion "on particular evidence relying on statements of [Victim] that invaded the province of the jury by vouching for [her] credibility."

On this record of preservation, then, we cannot find that Loper waived his initial objection—every subsequent citation sounded in the same part, all alike challenging Det. Lindhorst's competence to opine whether there was evidence of "power and control" in the case since such was not a matter of Det. Lindhorst's special expertise but was instead a matter reserved exclusively for the jury's consideration. In such circumstances, for us to characterize Loper's objections as too distinct in wording to apprise the court of the issues, would be to elevate form over substance to an inappropriate degree. *See, e.g., State v. Rogers*, 529 S.W.3d 906, 910 (Mo.App.E.D. 2017) (finding error was preserved, "[r]egardless of nomenclature," where all the subsequent assertions of error "consistently articulated a singular hazard").

Accordingly, we review for abuse of discretion the trial court's decision to admit Det. Lindhorst's opinion testimony. *State v. Blurton*, 484 S.W.3d 758, 769 (Mo.banc 2016). An abuse of discretion occurs only when the trial court's ruling clearly offends the logic of the circumstances or is so arbitrary and unreasonable that it shocks the sense of justice and indicates a lack of careful

consideration. *Id.* Prejudice must also be shown, not mere error, and we will reverse only if the defendant demonstrates that the error was so prejudicial as to deprive him of a fair trial—i.e., there was a reasonable probability the trial court's ruling affected the outcome of the trial. *Id.*

2. *The trial court abused its discretion by allowing the State to adduce Det. Lindhorst's opinion testimony that Loper exercised "power and control" over Victim here as charged.*

We now turn to the merits of Loper's claim with regard to Det. Lindhorst's testimony. We note that the parties contested whether Det. Lindhorst testified as an expert or as a lay witness here. We need not resolve this issue because the result we reach would be the same under either circumstance.

In Missouri, expert opinion testimony "should never be admitted unless it is clear that the jurors themselves are not capable, for want of experience or knowledge of the subject, to draw correct conclusions from the facts proved." *State v. Taylor*, 663 S.W.2d 235, 239 (Mo.banc 1984) (citing *Sampson v. Mo. Pac. R.R. Co.*, 560 S.W.2d 573, 586 (Mo.banc 1978)). Accordingly, "the essential test of admissibility of expert-opinion evidence is whether it will be helpful to the jury." *State v. Pickens*, 332 S.W.3d 303, 321 (Mo.App.E.D. 2011).

In the context of the matter before us, Missouri case law has effectively drawn a line between generalized opinion testimony on a subject—such as domestic abuse about which the jury may be unfamiliar and may need assistance to understand—and opinion testimony that applies the general principles to the specific evidence and crimes before the jury. The former is generally allowed but the latter is not because it tends to impermissibly comment on guilt or innocence, the credibility of witnesses, and to otherwise invade the province of the jury. *See, e.g., State v. Chism*, 252 S.W.3d 178, 182-83 (Mo.App.W.D. 2008) ("Expert testimony that comments directly on a witness's credibility invades the jury's province and is inadmissible. . . . Expert testimony,

10

however, that comments on how a victim's behavior relates to general behavior of someone who has been sexually abused is admissible.").

Indeed, in cases involving abuse, it has been repeatedly held that an expert's comments on the veracity of another witness are not helpful and therefore are deemed inadmissible. *Pickens*, 332 S.W.3d at 321 (citing State v. *Haslett*, 283 S.W.3d 769, 779 (Mo.App.S.D. 2009); *State v. Link*, 25 S.W.3d 136, 143 (Mo.banc 2000); *Taylor*, 663 S.W.2d at 240–41; *State v. Davis*, 32 S.W.3d 603, 608–9 (Mo.App.E.D. 2000)). Likewise, an expert may not express an opinion as to the guilt or innocence of the defendant. *Id.* (citing *Haslett*, 283 S.W.3d at 779; *State v. Harris*, 305 S.W.3d 482, 490–91 (Mo.App.E.D. 2010)). To do so would usurp the decision-making function of the jury. *Id.* (citing *State v. Churchill*, 98 S.W.3d 536, 539 (Mo.banc 2003)).

For similar reasons, a lay witness may not give an opinion when it has the effect of answering the ultimate issue the jury is to determine. *State v. Ferguson*, 568 S.W.3d 533, 540 (Mo.App.E.D. 2019) (citing *State v. Cason*, 596 S.W.2d 436, 440 (Mo.banc 1980)). Like expert testimony commenting on the guilt or innocence of the defendant, lay opinion testimony has been found to invade the province of the jury where it vouches for the credibility of the victim and thus lends improper weight on the ultimate issue reserved for the jury. *See id.* at 541 ("By allowing [the lay witness] to testify as to the believability of Victim's allegations, the trial court allowed her to bolster the credibility of Victim in a case where the jury's verdict hinged upon its finding Victim and her allegations to be credible.").

Applying these principles here, we find the trial court abused its discretion by allowing the opinion testimony of Det. Lindhorst because it commented on Loper's guilt of the charged acts of domestic violence and vouched for Victim's testimony and the credibility of the State's other witnesses on that subject. Especially here, where there was no DNA or fingerprint evidence

11

attributable to Loper, and Victim had no memory of the charged acts of domestic violence other than the attempted rape, the jury's determination that Loper committed those acts was necessarily reliant on its credibility assessment of the witnesses and on circumstantial evidence. Most notably with regard to Victim's wrist injury, since Loper testified that Victim had attempted suicide before and Victim admitted on cross-examination that she considered the possibility that she had cut herself, whether Victim's wrist injury was self-inflicted was a key exculpatory issue for the jury to decide. So, Det. Lindhorst's opinion testimony—which improperly placed a veneer of expertise on credibility issues reserved exclusively for the jury—infringed upon their decision-making function. *See Churchill*, 98 S.W.3d at 539 ("[Opinion] testimony that [the victim's] alleged abuse 'was real' infringed upon the decision-making function of the jury and prejudiced [the defendant] by bolstering [the victim's] testimony with the credibility of a professional.").

Here, as part of its case-in-chief, the State first adduced the following opinion testimony of Det. Lindhorst on the domestic violence concepts of "power and control," which in light of the foregoing authorities was *proper* opinion testimony because it did *not* usurp the jury's role as the fact-finder:

THE STATE: In your training and experience with these cases and all the training you've attended, have you become familiar with the concept of power and control?

DET. LINDHORST: I have.

THE STATE: Can you tell me what your understanding of these principles [is] and how you apply it to your day-to-day handling of your caseload?

DET. LINDHORST: In general, domestic violence, unlike a lot of crime, it's all about power and control and authority over one person. We have—a lot of our offenders this is what they do. They want to make sure that the victim is controlled all the time, no matter how long they've been in the relationship, no matter how long the relationship has been over. We try to get that from our victim to help us understand what happened in that relationship, because it's important for them to

12

> recognize and for us to be able to talk to them about what happened in the relationship, why is that power and control which includes harassment, stalking, threatening behavior, threats to the victim, threats to the victim's family. We try to get all that information, talk to the victims about it. We also train on that information.

As noted above, the trial court has broad discretion to admit testimony that "describes a 'generalization' of behaviors and other characteristics commonly found in those who have been victims" of abuse, including domestic violence, *Ferguson*, 568 S.W.3d at 543, and up to this point, Det. Lindhorst had provided only generalized information: that "domestic violence" is "all about power and control," and that Det. Lindhorst had become familiar with those concepts to better serve victims of domestic violence.

But the State then crossed the line between permissible and impermissible opinion testimony when it asked Det. Lindhorst to apply her generalized opinions on "power and control" to the evidence in this case:

THE STATE:        Did you have evidence of power and control in this case?

DET. LINDHORST: Absolutely.

THE STATE:        What were the signs you saw through your investigation?

DET. LINDHORST: The fact they hadn't seen each other months at a time to me is very—

Before Det. Lindhorst could specifically name any of the charged acts as a "sign" she saw that there was evidence of "power and control" here, Loper objected that the State was adducing inadmissible opinion testimony. The trial court overruled the objection, however, and the examination continued:

THE STATE:        Through your training and experience and dealing with all the cases you have over the years, what evidence of concepts of power and control did you witness in this case?

DET. LINDHORST: In addition, like I already said, the time that had passed between when the relationship had ended and the assault that occurred is not

13

uncommon. A lot of cases aren't exactly the same. It's telling since they hadn't been together in that long, the offender had thought maybe his power and authority over her had started to slip, which indicates he needs to come back and dominate. Additionally, the strangulation is a very intimate crime. Strangulation and also the cut on her wrist is very—the strangulation is very intimate. You have to be close to that person. When you strangle them, they go unconscious. That takes a lot of fight. You will be able to feel them stop breathing. You will be able to feel them kick or struggle with you . . . .

THE STATE:              [D]id you at some point identify who the offender was?

DET. LINDHORST:  Yes.

THE STATE:              Who did you identify it was?

DET. LINDHORST:  Mr. Loper.

We find the trial court abused its discretion in the following ways. First, Det. Lindhorst's testimony that there was "absolutely" evidence of the domestic-violence concepts of "power and control" here effectively told the jury that this was a domestic violence case, which eliminated self-infliction as a possibility. Such commentary on the guilt of the defendant is inadmissible. *Pickens*, 332 S.W.3d at 321 (citing *Churchill*, 98 S.W.3d at 539).

Second, Det. Lindhorst's testified she "witnessed" specific evidence in this case of "power and control" that included "the strangulation" and "the cut on [Victim's] wrist." This testimony invaded the province of the jury because it was the jury's prerogative to decide whether the Victim's wrist injury was self-inflicted. Both portions of Det. Lindhorst's testimony characterized critical evidence in the case that was to be put before the jury as, unequivocally, *evidence of domestic violence*. We are not persuaded by the State's contention that Det. Lindhorst testified merely that the evidence would have been "consistent with" a finding that domestic violence

14

occurred.[3] The detective's testimony directly and unequivocally applied the domestic violence concepts of "power and control" to the specific contested fact issues in this case which is improper because that is the jury's job.

Given these facts, we find Det. Lindhorst improperly commented on Loper's guilt, which invaded the province of the jury. *See id.* (citing *Deiner v. Sutermeister*, 178 S.W. 757, 761 (1915)) ("An [opinion witness] may not substitute his reasoning and conclusions for the reasoning and conclusions of the jury upon the issue, or issues, before the triers of fact."). This case is therefore like others in which Missouri courts have found reversible error, including plain error resulting in manifest injustice, from the trial court's admission of such improper commentary. *See Rogers*, 529 S.W.3d at 915-16 (finding fundamental error resulted from admission of opinion testimony of Child Advocacy Center interviewer that child's account of sexual abuse boasted numerous "indicators of reliability," including ability to name some of the same details described in the charges); *Williams*, 858 S.W.2d at 801 (finding the same where doctor was permitted to opine that children rarely lie about sexual abuse and "essentially don't lie" about who abused them, and that if the child was not asked leading questions then her spontaneous response "declares who it was [who sexually abused her]"); *Taylor*, 663 S.W.2d at 239-40 (finding reversible error resulted from admission of doctor's opinion who examined alleged rape victim that she "suffered rape trauma syndrome as a result of the [charged] rape incident she described").

Moreover, as our citations to *Rogers*, *Williams*, and *Taylor* evince, although Det. Lindhorst never explicitly asserted that Loper was guilty of the charged offenses, that is no prerequisite to a

---

[3] For this reason, we find to be inapposite the State's citations to *State v. Silvey*, 894 S.W.2d 662, 671 (Mo.banc 1995) (finding no error in the admission of opinion testimony that the victim "exhibited several behavioral indicators *consistent with* a child that has been sexually abused") (emphasis added), abrogated on other grounds by *State v. Porter*, 439 S.W.3d 208, 211-12 (Mo.banc 2014).

15

finding of error here. *See, e.g., Taylor*, 663 S.W.2d at 240 (characterizing the inadmissible opinion testimony as "implicit" that the victim was raped by the defendant as charged). Therefore, we find the trial court abused its discretion by admitting Det. Lindhorst's improper opinions, and we turn now to the question of prejudice to determine whether the trial court's error requires reversal.

3. *Because we conclude that the trial court's error was prejudicial, the judgment is reversed as to Loper's convictions of first-degree domestic assault and armed criminal action for cutting Victim's wrist—and also as to Loper's conviction of victim tampering, since it rests on his conviction of first-degree assault.*

We find that Loper was prejudiced by the trial court's error with regard to his convictions of first-degree domestic assault and armed criminal action for cutting Victim's wrist. Trial court error is prejudicial if there is a reasonable probability that the jury would have reached a different conclusion absent the error. *State v. McWilliams*, 564 S.W.3d 618, 629-30 (Mo.App.W.D. 2018) (citing *State v. Miller*, 372 S.W.3d 455, 472 (Mo.banc 2012)). Certainly, overwhelming evidence of guilt may lead an appellate court to conclude that a defendant was not prejudiced by trial court error. *Id.* (citing *State v. Banks*, 215 S.W.3d 118, 121 (Mo.banc 2007)). But where the State "relied heavily on testimonial evidence" to prove its case, Missouri courts have found that the evidence was not overwhelming. *See, e.g., Rogers*, 529 S.W.3d at 916 (citing *State v. Foster*, 244 S.W.3d 800, 803 (Mo.App.S.D. 2008); *Williams*, 858 S.W.2d at 800); *see also Churchill*, 98 S.W.3d at 539 n.8 (finding expert testimony that invaded the province of the jury "deprived [the defendant] of a fair trial because there was no physical evidence indicating that sexual abuse occurred"). In such cases, courts have also relied on the fact that the improper evidence, for its part, was not cumulative, and was highlighted by the State. *E.g., Rogers*, 529 S.W.3d at 916.

Here, for similar reasons, we find the evidence of Loper's guilt cannot be characterized as overwhelming in support of his convictions of first-degree domestic assault and armed criminal

16

action for cutting Victim's wrist.[4] First, although there certainly was extensive physical and other non-testimonial evidence here that Victim's wrist was severely cut, the State relied significantly on testimonial evidence to prove its case that Loper, not Victim, did it, and when Det. Lindhorst's improper testimony characterizing "the cut on [Victim's] wrist" as evidence of domestic violence was admitted, that directly contradicted Loper's defense to Victim's wrist injury, prejudicing him. *Cf. State v. Banks*, 215 S.W.3d 118, 121 (finding prejudice resulted where argument that evidence was overwhelming "ignore[d] that [the defendant's] principal defense was the credibility and unreliability of the witnesses"). Besides Det. Lindhorst's improper testimony, the State's charge that Loper cut Victim's wrist was supported mainly by the opinion testimony of Dr. Quattromani that Victim's wrist wound was not, as Loper contended, self-inflicted—which opinion, the doctor admitted, was in turn based partly on Victim's own assertions in that regard. The State even admits here that "defense counsel effectively cross-examined Dr. Quattromani about her opinion, eliciting concessions that it was possible that Victim's wound was self-inflicted . . . and that her opinion was partially influenced by Victim's denial that it was self-inflicted."

Furthermore, here as in *Rogers*, "[t]he improper evidence was not cumulative, and it was certainly highlighted." 529 S.W.3d at 916. Where Dr. Quattromani never testified that *Loper* cut Victim's wrist, just that Victim did not cut herself, only Det. Lindhorst's testimony here expressly and unequivocally inculpated Loper in doing so.[5] And the State greatly relied on Det. Lindhorst's

---

[4] In assessing whether the evidence was overwhelming, we do not view the evidence in the light most favorable to the State. *State v. Banks*, 215 S.W.3d 118, 122 (Mo.banc 2007) (citing *State v. Kusgen*, 178 S.W.3d 595, 596 (Mo.App.W.D. 2005); *State v. Leisure*, 796 S.W.2d 875, 880 (Mo.banc 1990)) ("Although in addressing the sufficiency of the evidence this Court views the evidence in the light most favorable to the State, . . . it does not do so when evaluating the potential prejudice of trial error . . . .").

[5] Det. Lindhorst's testimony also was not cumulative because Dr. Quattromani testified solely from the perspective of a treating physician and did not, like Det. Lindhorst, base her opinion about the wrist injury on any asserted qualifications handling domestic violence cases or experience with

17

testimony. The State's closing argument began thusly: "Power and control. At the beginning of this trial, I told you that those were two important words. After sitting here through this trial for the last four days, you now see why power and control applies to this case."

This central contention, a juror might reasonably have concluded, drew considerable force from Det. Lindhorst's opinions, as the sole witness to provide such testimony, that as a matter of fact the case involved evidence of "power and control," and that specifically "the cut on [Victim's] wrist" was such evidence. Later in its closing argument, the State also emphasized the significance and reliability of the testimony presented including Det. Lindhorst's about the application of the domestic violence concepts of "power and control" to this case:

> That day, as [Loper] was choking [Victim] with his hands around her neck and an erect penis and he was trying to rape her, he had all the control. . . . Look what happened when [Victim] tried to tell [Loper] no. You heard about the cycle of violence, ladies and gentlemen. You heard about these experts come and testify the cycle of violence is based in research. It's based in experience. . . . It's real. [Victim] was a part of it. She testified about the history of abuse with [Loper], black eyes, hitting, choking. That was real. . . . Ladies and gentlemen, a woman is 70 [percent] more likely at risk of dying when she leaves than when she stays. That's what we have here, ladies and gentlemen. That's exactly what happened with this brutal, heinous attack on April 3rd, 2015. [Loper] was losing his power. He didn't have control over [Victim] anymore. . . . That's who this guy is, ladies and gentlemen. That's who [Loper] is. When he doesn't get what he wants, he gets violent. . . . He controls and manipulates people around him.

Given these circumstances, we find this case is like *Rogers*, *Ferguson*, *Williams*, and others where the jury's verdict hinged on its assessment of the credibility of the State's witnesses, and prejudice resulted because opinion testimony of one of the State's witnesses invested a "scientific cachet" and "stamp of truthfulness" upon the credibility of the State's case, including the testimony of Victim. As in *Williams*, 858 S.W.2d at 801, here, due to the admission of Det. Lindhorst's

---

the concepts of "power and control." For multiple reasons, then, Dr. Quattromani's expert medical testimony was not "additional evidence of the same kind" as Det. Lindhorst's domestic violence opinion testimony "tending to prove the same point as other evidence already admitted." *See State v. Green*, 603 S.W.2d 50, 51 (Mo.App.E.D. 1980) (defining "cumulative evidence" as such).

18

opinions "[t]he danger was too great that the jury accepted [Det. Lindhorst's] testimony as conclusive of [Loper's] guilt without making an independent determination" of the credibility of the State's case that Loper cut Victim's wrist and her wound was not self-inflicted. Therefore, as in *Williams*, we find in this case that "[t]he improperly admitted evidence was not only demonstrably prejudicial, but given the facts and circumstances of the case, it was fundamental error." *Id.* Accordingly, the trial court's judgment must be reversed as to Loper's convictions of first-degree domestic assault and armed criminal action for cutting Victim's wrist.

Furthermore, we find the judgment must be reversed as to Loper's conviction of victim tampering, because as submitted to the jury, it was predicated on his conviction of first-degree domestic assault. Here, the jury was instructed that to find Loper guilty of victim tampering, they first had to find "that E.S. was the victim of the crime of domestic assault in the first degree that occurred on or about April 3, 2015 . . . ." In other words, first-degree domestic assault was submitted as the predicate offense of the charge of victim tampering. Consequently, Loper's conviction of victim tampering must be reversed here together with his conviction of first-degree assault, since only a second-degree assault conviction remains. Our cases make clear that where the jury's determination that the predicate offense submitted in the instructions occurred was tainted by reversible error, a conviction for victim tampering based on that determination cannot remain standing alone. *Cf. State v. Weems*, 840 S.W.2d 222, 228 (Mo.banc 1992) (finding conviction of armed criminal action, like victim tampering here, must be reversed where it "was dependent upon a finding by the jury that, in accord with its instructions, [the defendant] committed [a separate predicate offense]"—in *Weems*, first-degree murder—and such finding was tainted by reversible error, namely failure to give a self-defense instruction); *State v. Granger*, 966 S.W.2d 27, 30 (Mo.App.E.D. 1998) (reversing first-degree burglary conviction for insufficient

19

evidence and remanding for entry of judgment of conviction of lesser included offense of first-degree trespass, but finding victim tampering conviction must be reversed because it was predicated specifically on finding that first-degree burglary occurred).

4. *The judgment is affirmed as to Loper's convictions of second-degree domestic assault and armed criminal action for strangling Victim with a telephone cord, and also as to his conviction of first-degree attempted rape, because the evidence was overwhelming that Loper committed those offenses.*

Turning to Loper's remaining convictions, we find the evidence of his guilt was overwhelming and Loper was not prejudiced as to those counts by the admission of Det. Lindhorst's testimony. The State amply proved that Loper strangled Victim with a telephone cord, and that he attempted to rape Victim while strangling her with his hands. The State presented testimony from several witnesses, and extensive photographic and other documentary evidence, that after Loper visited her apartment, Victim was left with marks on her neck—a "pattern injury," according to Kathy Howard—that were consistent with being strangled with a "ligature," or cord. The State also adduced similar evidence that Victim had other injuries that suggested she was strangled, whether manually or otherwise, including hemorrhaging in her eyes; burst blood vessels in her face; facial and neck lacerations; lip swelling; and chin and tongue bruising. Considered as a whole, this evidence not only buttressed Victim's testimony that Loper tried to rape her by strangling her with his hands, but also abundantly supported the State's allegations that Loper strangled her with a telephone cord.

Unlike with Victim's wrist injury, Det. Lindhorst's testimony did not clearly prejudice Loper here because the State did not rely so significantly on testimonial evidence in establishing that Victim's facial and neck injuries were the result of domestic violence. As mentioned above, the State presented plentiful non-testimonial proof in the form of photographic and documentary evidence of Victim's facial and neck injuries to meet its burden of showing beyond a reasonable

20

doubt that Loper strangled Victim with a telephone cord, and that he attempted to rape her by strangling her with his hands. Also, because Loper never suggested that Victim caused her own facial and neck injuries—as he did that she cut her own wrist—there was no question that if the jury found the State's non-testimonial evidence established Victim was strangled, then Loper was the one who did it. With regard to Victim's wrist injury, by contrast, Loper's defense was that Victim's wrist injury was just as real and severe as the State represented but was nevertheless self-inflicted, and the State relied significantly on the opinion testimony of Det. Lindhorst and Dr. Quattromani to prove otherwise. As a result, while the prejudice was palpable when Det. Lindhorst's testimony directly contradicted Loper's defense that Victim's wrist injury was self-inflicted, we have no similar concerns that Det. Lindhorst's testimony played a decisive role in derailing Loper's defense to the State's allegations that he strangled Victim.

5. *The trial court did not abuse its discretion by admitting the expert opinion testimony of Michelle Schiller-Baker.*

We now turn to Loper's sole additional evidentiary challenge that we find is likely to arise on remand. Loper claims that the trial court abused its discretion by admitting the testimony of Michelle Schiller-Baker, the executive director of a domestic violence shelter, regarding the general behavior of victims of domestic violence. Loper raises two arguments that her testimony was inadmissible. First, Loper contends that Ms. Schiller-Baker was not qualified to give expert testimony on this topic, specifically because she lacked formal education or licensure in the fields of psychology, medicine, or counseling. Second, Loper asserts that Ms. Schiller-Baker's testimony invaded the province of the jury, like Det. Lindhorst's, by vouching for Victim's credibility and commenting on Loper's guilt of the charged offenses.

We disagree with both of Loper's arguments. With regard to Ms. Schiller-Baker's qualifications, there is no requirement under Missouri law that she possess formal education or

21

licensure to testify as an expert. Rather, "[a]n expert is qualified by her 'knowledge, skill, experience, training *or* education.'" *State ex rel. Gardner v. Wright*, 562 S.W.3d 311, 319 (Mo.App.E.D. 2018) (emphasis added) (quoting § 490.065.2(1)). Indeed, "[s]ection 490.065.2(1) expressly contemplates that an expert may be qualified on the basis of *experience alone.*" *Id.* at 321 (emphasis added). "No one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience." *Id.* (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999) (internal quotation marks omitted)); *see also Brown v. State*, 450 S.W.3d 847, 852 (Mo.App.S.D. 2014) (quoting *State v. Futo*, 932 S.W.2d 808, 820 (Mo.App.E.D. 1996)) ("[The expert's] knowledge or skill need not come from formal sources; 'practical experience, rather than scientific study or formal training, may qualify a witness to testify as an expert.'"). Therefore, we find no issue with Ms. Schiller-Baker's expert qualifications.

As to Loper's argument that Ms. Schiller-Baker's testimony invaded the province of the jury, we also find no error. Loper contends that Ms. Schiller-Baker's testimony passed beyond the bounds of admissible generalized testimony, which describes behaviors and characteristics commonly found in victims, *State v. Rogers*, 529 S.W.3d 906, 911 (Mo.App.E.D. 2017) (noting that the trial court has "broad discretion in admitting generalized testimony," unlike particularized testimony, which "concerns a specific victim's credibility as to the abuse"), and invaded the province of the jury by commenting on Loper's guilt of the charged offenses. We disagree.

We find that unlike Det. Lindhorst's impermissible opinion testimony about "power and control" analyzed above, Ms. Schiller-Baker's testimony was directed properly and solely at providing the jury with helpful information about a matter not within their common experience: the *general behavior* of domestic violence victims and their tendency to delay disclosure, deny abuse, and return to their abusers. *See State v. Williams*, 858 S.W.3d 796, 799 (Mo.App.E.D.

22

1993) ("[G]eneral profile evidence of . . . abuse victims can be a proper topic of expert testimony . . . to assist the jury's understanding of the behavior of . . . abused [victims], a subject beyond the knowledge of an ordinary juror."). Ms. Schiller-Baker's testimony was based on her 35 years of experience working personally with over 4,000 women involved in abusive relationships, and it did not characterize or even mention *any* of the facts of this case. Indeed, Loper acknowledges that Ms. Schiller-Baker was not informed of any of the facts of this case, deliberately to preserve her ability to speak generally without personalizing any of her opinions here. In light of these facts, we find no error in the admission of Ms. Schiller-Baker's testimony.

## Conclusion

For the reasons stated above, the judgment of the trial court is affirmed in part and reversed and remanded in part.

_____
James M. Dowd, Presiding Judge

Gary M. Gaertner, Jr., J., and
Robin Ransom, J., concur.

23